ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

HILLARY T. IRVIN (MDBN 1712130257)
SOPHIA COOPER (CABN 320373)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7181
    Fax: (415) 436-7027
    Hillary.Irvin@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **CASE NO. 3:23-CR-00030-SI** |
| | ) | |
| Plaintiff, | ) | **GOVERNMENT'S MOTIONS IN LIMINE** |
| | ) | |
| v. | ) | |
| | ) | |
| OLVIN ISAAC GUTIERREZ-NUNEZ, et al, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## GOVERNMENT'S MOTIONS IN LIMINE

The United States submits the following motions *in limine*. The government requests the opportunity to supplement these motions *in limine* if additional legal issues arise requiring the Court's consideration. The government also requests leave to supplement these motions should the Defendant produce any reciprocal discovery under Federal Rule of Criminal Procedure 16(b) after the date of this motion.

## BACKGROUND

### A. **Background on Nunez Investigation**

In April 2022, an undercover officer from the San Francisco Police Department approached

Defendant Olvin Isaac Gutierrez Nunez, who was standing on the 700 block of Eddy Street in the Tenderloin of San Francisco. The officer asked for $100 worth of "yellow," which is a street name for fentanyl. Nunez produced a bag of fentanyl and exchanged the drugs for $100 in cash. Nunez then provided a phone number ending in 9461, in order for the undercover officer to contact him to purchase fentanyl again. Weeks later, in May 2022, Nunez settled in the same location on Eddy Street, peddling fentanyl to the addicts languishing in the Tenderloin District. Again, an undercover officer approached Nunez to buy $100 of fentanyl, which Nunez carefully weighed on a scale in the open street before selling it to the undercover officer. Officers did not arrest Nunez at that time because they knew that a much larger source of drugs was likely located at his house in Oakland.

Officers used these two undercover fentanyl purchases to establish probable cause to obtain a series of search warrants. Officers used Nunez's cell phone number to obtain cellular ping data from his cell phone provider, T-Mobile. Those records showed near daily trips from Nunez's residence in Oakland to the Tenderloin, where officers saw Nunez steadily pushing fentanyl into the community. Officers specifically saw Nunez travel back and forth from Oakland to the Tenderloin occasionally driving a gray BMW sedan, which was registered to a residence located at 2051 23rd Avenue in Oakland, California. Officers surveilled the residence on multiple days in October and saw Nunez leave the house and travel to the Tenderloin where he dealt drugs all day before returning back to his home in Oakland.

### B. Background on Cruz Medina Investigation

Officer Blake Cunningham began an investigation into Cruz Medina in early 2022 upon witnessing Cruz Medina dealing in the Tenderloin. Officers obtained Cruz Medina's phone number ending in 8701. Officer Cunningham used that phone number to obtain cell site location data for Cruz Medina, which showed regular movement from an unidentified location in Oakland to the Tenderloin. Additionally, Officer Cunningham regularly observed Cruz Medina conducting hand-to-hand drug transactions at night.

On October 12, 2022, officers observed Carlos Cruz Medina (aka Marvin Alexander Rodriguez Flores) selling narcotics in the Tenderloin in San Francisco. Officers observed Cruz Medina park a silver Infiniti sedan on Golden Gate Avenue and walk towards the Tenderloin where he sold narcotics to

1  addicts hunched around him, and, like Nunez, traffic narcotics by steadily pushing fentanyl into the

2  community. Officer Blake Cunningham's previous investigation into Cruz Medina confirmed that

3  **C. Execution of the Search Warrant**

4  On October 12. 2022, officers from the San Francisco Police Department obtained a search

5  warrant for Nunez's person, the gray BMW, and his residence. At the time, Nunez had two active bench

6  warrants from Alameda County for failing to appear in two narcotics distribution cases. Nunez also had

7  prior arrests for carrying firearms and daggers, so officers recognized additional surveillance was

8  necessary for officer safety and anticipated that a lethal weapon could be located in the residence.

9  The following day, October 13, 2023, SFPD officers started surveillance at the residence. At

10  around 1:15pm, Gutierrez Nunez left the apartment carrying a black backpack and walked toward his

11  BMW, which was parked in front of the residence. Officers activated their body-worn cameras and

12  converged on Gutierrez Nunez to arrest him. A search of Gutierrez Nunez's backpack revealed a bag

13  containing chunks of fentanyl, a scale, and numerous plastic bags. Officers seized Nunez's BMW key

14  fob which he threw aside when he saw officers coming. Officers used the fob to open the car, which

15  contained documents in Nunez's name as well as a magazine of firearm ammunition.

16  Officers proceeded to the residence where they encountered defendant Cruz Medina, Joshua

17  Melendez, and three women. The apartment had two bedrooms and a joint living room.  Melendez was

18  sitting on the couch in the living room. Defendant Cruz Medina was asleep in the first bedroom. Officers

19  immediately recognized Cruz Medina and Melendez from their observations of fentanyl dealing in the

20  Tenderloin.

21  SFPD Officers Cunningham and Zografos searched the first bedroom. Within the first bedroom,

22  officers found fentanyl, methamphetamine, and heroin packaged for distribution and over $14,000 in

23  cash. Specifically, in a backpack located on a dresser, officers found fentanyl, methamphetamine, and

24  heroin packaged for distribution. In that same dresser, officers found a bail bonds receipt bearing Cruz

25  Medina's name.  Officers also recovered narcotics from the closet of bedroom 1 which they mistakenly

26  believed came from a backpack belonging to Joshua Melendez.  On further review of the body-worn

27  camera, it was determined that the narcotics did not originate in the backpack.  The charges against

28  Joshua Melendez were dismissed.

Officers Scafani and Hayes searched the second bedroom. Inside of that bedroom, they found over 5 pounds of fentanyl, over $7,000 in cash, ammunition, and, ironically, a drug court completion certificate from the San Francisco Community Justice Center issued to Nunez. In addition to clear indicia that Nunez occupied that bedroom, they also found tools of the drug dealing trade such dyes used to color fentanyl, fentanyl pill pressing equipment, drug dealing roster pay-owe sheets, drug cutting agents, and a respirator mask. The officers also found extensive ammunition hidden throughout the residence, including 9 rifle rounds, a high-capacity extended magazine loaded with 24 rounds, and 46 additional 9mm rounds of ammunition.

Officer Puccinelli searched the front of the residence where he noticed gapping in the fence boards that surrounded the apartment, which was on the ground floor. Officer Puccinelli discovered an AR-15 rifle-style firearm that was a privately manufactured firearm, also known as a ghost gun. Individuals can legally purchase separate pieces of a firearm, to build those pieces into an unregistered, and therefore untraceable, firearm. The ghost gun found at the residence did not have a serial number and was capable of accepting a large capacity magazine. Officers linked the rifle found at the residence and the rifle ammunition found in Nunez's bedroom and obtained a search warrant for Nunez's DNA. Those DNA results showed that Nunez's DNA profile was on the rifle found at his residence. At the scene, Officer Puccinelli secured the rifle and provided it to Officer Cunningham who transported it back to the station.

After officers on the scene gathered the narcotics, ammunition, and cash, they placed them in separate bags attributable to each defendant for transport. The lead officer, Alexis Gomez, provided the evidence to Officer Christina Hayes. Officer Hayes transported the evidence from the residence to the San Francisco Police Department where Officer Hayes used a TruNarc analyzer to test the drugs. Officer Gomez was present during the testing of the drugs.  The results of the search warrant and presumptive testing of the drugs were produced in a report authored by Officer Gomez, and additionally documented in separate supplemental reports authored by Officers Cunningham, Hayes, and Puccinelli.

At trial, the government intends to call the SFPD officers described above who were percipient witnesses of the defendant's drug trafficking activities and participants in the search.  For the reasons described below, the government does not intend to call Officer Hayes as a witness.  Absent other

1   stipulations, the government also intends to call expert witnesses who performed lab testing of the

2   narcotics seized, the criminalist who determined that Nunez's DNA is on the firearm, and a DEA agent

3   who will provide opinion testimony on drug trafficking and particularly the field of fentanyl and

4   methamphetamine distribution in the Bay Area and indicia of intent to distribute and sell those drugs.

5          The United States requests rulings on the motions as outlined below.

6                                            **ARGUMENT**

7   **Motion in Limine No. 1:   The Drugs Recovered from the Residence Are Admissible**

8          Evidence is generally admissible if it is authentic, relevant, and not unduly prejudicial within the

9   trial court's discretion. Fed.R.Evid. 104, 401, 403. The authentication of evidence is "satisfied by

10  evidence sufficient to support a finding that the matter in question is what its proponent claims." *Id.* at

11  901(a). When introducing evidence during trial, the government bears the burden of presenting

12  "sufficient proof so that a reasonable juror could find that the evidence was in substantially the same

13  condition as when it was seized." *United States v. Harrington*, 923 F.2d 1371, 1374 (9th Cir.1991);

14  *United States v. Avalos-Gonzales*, 156 F.3d 1239 (9th Cir. 1998). Any defects in the chain of custody go

15  "to the weight, not the admissibility, of the evidence." *United States v. Matta-Ballesteros*, 71 F.3d 754,

16  769 (9th Cir.1995). A lapse in custodial documentation when presented to a jury, does not render the

17  evidence inadmissible so long as there is a "reasonable probability the evidence has not been changed in

18  important respects." *United States v. Diaz-Villasenor*, 68 F. App'x 791, 792 (9th Cir. 2003) (citing

19  *Harrington*, 923 at 1374). Additionally, the government is not required to call the custodian of the

20  evidence. *See Gallego v. United States*, 276 F.2d 914, 917 (9th Cir.1960) (prosecution is not required to

21  produce all persons who had possession of evidence).

22          "In the absence of any evidence of tampering, a presumption exists that public officers properly

23  discharge their official duties." *Harrington*, 923 F.2d at 1374 (internal citations and quotations omitted).

24  "Merely raising the possibility of tampering is not sufficient to render evidence inadmissible." *Id.* A

25  lapse in custodial documentation, even assuming one occurred here, does not render evidence

26  inadmissible. *Id.* For example, in *United States v. Solorio*, the Ninth Circuit held the drug evidence was

27  sufficient to sustain a conviction for distribution of a controlled substance, despite a possible "gap in the

28  chain of custody for the bag carrying the drugs." 669 F.3d 943, 954–56 (9th Cir. 2012).

1    Here, the chain of custody evidence will show that the drugs that were seized, transferred, and

2    sealed in conformance with SFPD protocol were the same drugs seized at the time of the defendants'

3    arrest.  Any contention of a possible break in the chain of custody goes to the weight of the evidence, not

4    admissibility. *United States v. Matta-Ballesteros*, 71 F.3d 754, 769 (9th Cir. 1995). Officers

5    Cunningham and Zografos participated in the search of Cruz Medina's bedroom and can testify to the

6    condition of the drugs recovered from bedroom 1.  Their body-worn camera videos show the condition

7    of the drugs during execution of the search warrant. Likewise, Officer Scafani participated in the search

8    of bedroom 2 and can testify to the condition of the drugs when recovered, as reflected on his body-

9    worn camera. After the transport of the evidence from the residence to the police station, Officer Gomez

10   was present during the testing of the drugs and can testify to the identification of the drugs being in the

11   same condition as when she seized them at the defendants' residence.  In addition, the results of the

12   search warrant and presumptive testing of the drugs were produced in a report authored by Officer

13   Gomez, and additionally documented in separate supplemental reports authored by three other officers.

14   Any alleged lapse in the chain is only in the mere transport of the drugs from the residence to the SFPD

15   station. There is no requirement to call everyone who touches an object like the transport officers.

16   *Gallego*, 276 F.2d at 917.  Regardless, the chain of custody of the sealed drugs bears on the weight of

17   the evidence not its admissibility.

18        Additionally, admission of the drugs also does not violate the Defendants' confrontation clause

19   rights. The Confrontation Clause of the Sixth Amendment guarantees that "[i]n all criminal

20   prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." In

21   *Crawford v. Washington*, the Supreme Court held that this "bedrock procedural guarantee" prohibits the

22   admission of "testimonial statements of a witness who [does] not appear at trial unless [the witness is]

23   unavailable to testify, and the defendant ha[s] had a prior opportunity for cross-examination." 541 U.S.

24   at 42, 53–54 (2004). The Court provided various examples of testimonial evidence, including materials

25   such as "affidavits, custodial examinations, prior testimony that the defendant was unable to cross-

26   examine" and other documentary evidence prepared by individuals for trial. *Id.*  In *Melendez–Diaz v.*

27   *Massachusetts*, the Supreme Court held that forensic drug test reports identifying a specific substance

28   were testimonial statements under *Crawford*, requiring the drug analysts who completed the report to be

1   subject to confrontation. 557 U.S. 305 (2009). The Court reasoned that the test reports were functionally

2   affidavits provided by the drug analyst, wherein the individual swore that the drug test results were

3   accurate and they were "made under circumstances which would lead an objective witness reasonably to

4   believe that the statement would be available for use at a later trial," *Id.* (quoting *Crawford*, 541 U.S. at

5   52).

6         Here, the government seeks only a pre-trial ruling on the admissibility of the narcotics recovered

7   from execution of the search warrant on October 13, 2022. A separate live witness will testify that the

8   substances recovered are fentanyl and methamphetamine. The narcotics recovered from the house are

9   not testimonial in nature. Therefore, there is no confrontation issue for admitting the fentanyl and

10  methamphetamine recovered from the Defendants in this case. Should the Court have concerns, the

11  government would welcome an evidentiary hearing on this in advance of trial.

12  **<u>Motion in Limine No. 2</u>: Any Examination of Officer Christina Hayes Must be Limited to Relevant Evidence**

13

14        Officer Christina Hays is currently under internal investigation for misconduct relating to her

15  relationship with a confidential informant.  That confidential informant was not involved in this case.

16  The existence of the Hayes investigation was disclosed to defense counsel. The government does not

17  intend to call Officer Christina Hayes as a witness. Should either defendant choose to call Officer Hayes

18  as a witness, that testimony must be limited in scope to relevant evidence that is not unduly prejudicial.

19  This is appropriate because improper questions related to Officer Hayes' relationship with the

20  confidential informant—not one involved in or related to this case— is outside the scope of Officer

21  Hayes involvement in this case and is highly inflammatory and will serve only to mislead and confuse

22  the jury.

23        Case law in this Circuit holds that unsustained complaints against police officers should not be

24  admitted at all.  *See, e.g.*, *United States v. Jones*, 2005 WL 348398, *1-3 (9th Cir. Feb. 14, 2005)

25  (affirming Judge Susan Illston's decision to preclude cross-examination of officers on unsustained

26  complaints) (unpublished); *Brown v. Gutierrez*, 2006 WL 3065574, at *2-3 (N.D. Cal. Oct. 27, 2006) (in

27  civil case, holding that "[t]estimony about the allegations involved in any investigation are excluded"

28  because there was "no finding . . . that [the officer] lied or made false statements"); *Morris v. Lanpher*,

2007 WL 1026324, at *1-2 (W.D. Mo. Mar. 27, 2007) (in civil case, precluding questioning of police officer witnesses regarding unsustained complaints against them under Fed. R. Evid. 402).

The government does not ask that the defense be wholly precluded from cross-examining Officer Hayes. The government seeks a pre-trial ruling *only* that the scope of the examination be limited to relevant evidence and Officer Hayes' actual involvement in this case.  It would be highly prejudicial, misleading, and confusing to the jury to allow defense counsel to delve into a mini-trial focused on Officer Hayes unsustained conduct. Rather, any examination of Officer Hayes should be limited to her factual involvement involving the individuals and circumstances in the case alone.

Under these circumstances, the court should require the defense to proffer what it intends to elicit from Officer Hayes prior to calling her as a witness.  And to the extent the defense proffers that it intends to call Officer Hayes only to impeach her, that would be improper and the Court should not allow it.  *See e.g.*, *United States v. Williams*, No. CR-13-00764-WHO (ECF No. 1343 at 4-5) (N.D. Cal. Sep. 28, 2017) (requiring that the use of *Henthorn* material be vetted with Court prior to questioning, outside the presence of the jury, except where the questioning concerns express, sustained finding of untruthfulness, false statement, or false report); *United States v. Farley*, No. CR 15-00092- TEH (ECF No. 62 at 17) (N.D. Cal. Nov. 9, 2015) (order establishing procedure for proffer outside the presence of the jury after government completes direct examination of law enforcement witnesses); *United States v. Cerna*, No. CR-08-00730-WHA (ECF No. 3644 at 24) (N.D. Cal. Mar. 3, 2011) (requiring that the use of *Henthorn* material be vetted with court prior to questioning, outside the presence of the jury, except where the questioning concerns express, sustained finding of untruthfulness, false statement, or false report); *United States. v. Cerna*, No. CR-08-00730-WHA (ECF No. 5230 at 11- 12) (N.D. Cal. Oct. 12, 2011) (same); *see also* Fed. R. Evid. 103(d) ("To the extent practicable, the court must conduct a jury trial so that inadmissible evidence is not suggested to the jury by any means.").

## **Motion in Limine No. 3:  Admit Relevant, Inextricably Intertwined, Evidence of Drug Trafficking for the Government's Case in Chief**

The government moves this Court for an *in limine* order admitting relevant, inextricably intertwined, and "other acts" evidence regarding evidence of drug trafficking by the defendants.

Evidence is relevant so long as it has any tendency to make a fact of consequence to the case

more or less probable. Fed. R. Evid. 401(a), (b). The evidence does not need to prove an ultimate issue. *United States v. Boulware*, 384 F.3d 794, 805 (9th Cir. 2004). It does not need to prove an element of a charged offense, but merely has to make a fact that matters to the case's outcome more or less probable than it would have been without the evidence. *See id.* When making relevance determinations, courts should be mindful of the proponent's theory of the case. *See Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008); *Windham v. Merkle*, 163 F.3d 1092, 1103–04 (9th Cir. 1998).

Evidence of "other acts," meanwhile, is generally governed by Rule 404(b). However, other acts evidence "is not subject to Rule 404(b) analysis if it is 'inextricably intertwined' with the charged offense." *United States v. Beckman*, 298 F.3d 788, 793-94 (9th Cir. 2002) (internal citation omitted); *see also United States v. Soliman*, 813 F.2d 277, 279 (9th Cir. 1987). This kind of inextricable link can occur in one of two ways: (1) when "particular acts of the defendant are part of . . . a single criminal transaction," or when (2) "the 'other act' evidence . . . is necessary [] in order to permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime." *Beckman*, 298 F.3d at 794 (citation omitted).

Evidence of a crime, wrong, or other act that is not inextricably intertwined with the charged conduct may still be admissible in a criminal case to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid. 404(b)(2). It is well established that Rule 404(b) "is a rule of inclusion—not exclusion." *United States v. Curtin*, 489 F.3d 935, 944 (9th Cir. 2007) (en banc). "Once it has been established that the evidence offered serves one of [the purposes authorized by Rule 404(b)(2)], . . . the only conditions justifying the exclusion of the evidence are those described in Rule 403 . . . ." *Id.* (internal quotation marks omitted). Thus, "[u]nless the evidence of other acts *only* tends to prove propensity, it is admissible." *United States v. Castillo*, 181 F.3d 1129, 1134 (9th Cir. 1999) (emphasis added); *United States v. Jones*, 982 F.2d 380, 382 (9th Cir. 1992) (holding that prior acts are admissible "so long as the acts tended to make the existence of [the defendant's] knowledge or intent more probable than it would be without the evidence"). Other acts evidence is admissible under Rule 404(b) if it: (1) tends to prove a material point in issue; (2) is not too remote in time; (3) is proven with evidence sufficient to show that the act was committed; and (4) if admitted to prove intent, is similar to the offense charged." *Beckman*, 298 F.3d at 794 (citations

omitted); *accord United States v. Ramirez-Robles*, 386 F.3d 1234, 1242 (9th Cir. 2004) (citations omitted).

Here, the government's presentation of the facts relating to the charged conduct *requires* the admission of evidence concerning the observed drug trafficking activities of both defendants. Specifically, Nunez sold fentanyl to an undercover officer in April and May of 2022. During the first sale, Nunez provided a phone number which led to cell site evidence that revealed the location of his residence. Officer Alexis Gomez obtained a search warrant for that residence by specifically relying on the two prior fentanyl purchases and the cell site location data. As recently as the day before the execution of the search warrant, both Nunez and Cruz Medina were seen by SFPD officers dealing fentanyl in the Tenderloin which formed the basis for officers' actions at the scene of the search warrant. The evidence of drug trafficking from both defendants leading up to the execution of the search warrant should be admitted because it is a substantive part of and inextricably intertwined with the charged offenses.   The only way for the government to tell the jury a coherent and comprehensible story regarding the commission of the crime is by starting with the officers' observations of the defendants in the Tenderloin and accessing the residence and vehicles involved in this investigation.  As a result, Rule 404(b) is simply not implicated.  *Beckman*, 298 F.3d at 793-94.

Even if the Court views the defendants' actions leading up to the search warrant execution through the lens of Rule 404(b), the instances in which officers observed both defendants selling drugs in the Tenderloin are highly probative of their intent with respect to the drugs recovered from Nunez's backpack and in the residence.

**Motion in Limine No. 4**:  **Admit Relevant, Inextricably Intertwined, and Evidence of the Firearm for the Government's Case in Chief**

The government moves this Court for an *in limine* order admitting relevant, inextricably intertwined, and "other acts" evidence regarding the presence of ghost gun at the defendants' residence.

Here, officers found a firearm that did not have a serial number (ghost gun) stuffed into a trash

bag between the slats of the fence at the residence.  Officers also found drugs and drug paraphernalia, in other words, evidence of drug trafficking, at the house.  Officers swabbed the firearm and submitted the swab for DNA testing. The DNA report showed "very strong support" that the DNA on the firearm was a match to Nunez.  The firearm should be admitted as inextricably intertwined evidence of drug trafficking.  The nexus between the firearm and alleged drug trafficking is clear.  *See United States v. Mosley*, 465 F.3d 412, 417 (9th Cir. 2006) (explaining that the Government must prove a nexus between the firearm and the illegal drug trafficking).  The firearm was found at the locus of the drug trafficking stash house - the residence where both defendants live.  Drugs, drug trafficking paraphernalia, and dozens of rounds of ammunition were found at the residence.  The location of the firearm at the front of the house makes it clear that it could be used to protect pounds of fentanyl concealed within the residence. The ammunition found in Nunez's BMW also illustrates that the firearm was kept for protection because he planned to transport the ammunition with the drugs he was arrested carrying, which as his near daily pattern suggest, was to the Tenderloin to deal fentanyl.

The government is also noticing that its expert witness on drug trafficking, DEA Special Agent David Mateer, will testify about the presence of firearms as tools of the trade for drug traffickers. Through Special Agent Mateer's testimony, the jury can properly infer that the presence of a firearm and ammunition associated with Nunez and the car he used to drive to the Tenderloin is additional evidence of his intent to distribute the drugs found in his possession.

**Motion in Limine No. 5:  The Defense Should Be Barred from Offering Evidence that Could Have Been, but Was Not, Produced in Discovery**

The Court should preclude the defense from introducing evidence that it should have produced, but did not produce, under the reciprocal discovery obligations of Federal Rule of Criminal Procedure 16(b), and pursuant to Federal Rule of Criminal Procedure 26.2 (reverse Jencks).

### Reciprocal Disclosure Under Rule 16(b)

The reciprocal discovery requirements of Rule 16(b) require the Defendant to produce certain

1  evidence that he intends to use in his case-in-chief at trial, including documents, data, photographs, and

2  other tangible objects; "results or reports of any physical or mental examination and of any scientific test

3  or experiment"; and "a written summary of any [expert witness] testimony that [he] intends to use under

4  Rules 702, 703, or 705 of the Federal Rules of Evidence." Fed. R. Crim. P. 16(b)(1).  To date, the

5  Defendant provided one page of discovery.  The government therefore seeks an order precluding the

6  Defendant from introducing at trial any evidence that should have been, but was not, produced under the

7  reciprocal discovery obligations of Rule 16(b). *See* Fed. R. Crim. P. 16(d)(2)(C) (authorizing such an

8  order).

9  **Reciprocal Disclosure Under Rule 26.2**

10  Federal Rule of Criminal Procedure 26.2(a) provides:

> After a witness other than the defendant has testified on direct examination, the court, on motion of a party who did not call the witness, must order an attorney for the government or the defendant and the defendant's attorney to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter of the witness's testimony.

15  The statute embodying the rule was enacted, among other reasons, to "place in the criminal rules the

16  substance of . . . 18 U.S.C. § 3500 (the Jencks Act)."  Fed. R. Crim. P. 26.2 Advisory Committee Notes.

17  Pursuant to Rule 26.2(a), neither the government nor a defendant is required to produce witness

18  statements until after the witness's testimony on direct examination.  The government intends to produce

19  any witness statements before trial.  Because of the reciprocal nature of Rule 26.2, and in the interest of

20  expediting trial proceedings, the defense should be required to make a pretrial production of the

21  statements of any witness it intends to present.  If the defense declines to produce such witness

22  statements until after direct examination, the trial will be delayed unnecessarily because the government

23  will need time to review those statements prior to cross-examination.

24  **Motion in Limine No. 6**:  **All Witnesses Except the Case Agent and the Defendants Should Be Excluded from the Courtroom**

26  Under Federal Rule of Evidence 615, "[a]t a party's request, the court *must* order witnesses

27  excluded so that they cannot hear other witnesses' testimony." Fed. R. Evid. 615 (emphasis added).

28  However, "a person whose presence a party shows to be essential to presenting the party's claim or

1   defense" should not be excluded from the courtroom during trial. *Id.* Case agent Alexis Gomez been

2   critical in investigating this case and is an integral parts of the government's trial team. All other

3   witnesses (excepting the defendants, should they elect to testify) should be excluded under Rule 615.

4   **Motion in Limine No. 7:  The Defense Should Not Be Allowed to Reference Punishment or**

5   **Conviction Consequences in Front of the Jury, or Attempt to Elicit Jury Sympathy or**
    **Nullification.**

6            The government moves to preclude as irrelevant and unduly prejudicial any reference by the

7   defense to the defendants' potential sentence or punishment, potential collateral consequences of

8   conviction, or the fact that this case has been ongoing for an extended period during all phases of the

9   trial, including jury selection, opening statements, examination of witnesses (including the defendants, if

10  either elects to testify), and summation.

11           "It has long been the law that it is inappropriate for a jury to consider or be informed of the

12  consequences of their verdict." *United States v. Frank*, 956 F.2d 872, 879 (9th Cir. 1991). This is so

13  because informing the jury about potential sentences or "other matters relating to [the] disposition of the

14  defendant" tends to "'draw the attention of the jury away from their chief function as sole judges of the

15  facts, open the door to compromise verdicts and to confuse the issue or issues to be decided.'" *Id.*

16  (quoting *Pope v. United States*, 298 F.2d 507, 508 (1962)) (italics omitted). Indeed, the Supreme Court

17  has determined that "providing jurors sentencing information invites them to ponder matters that are not

18  within their province, distracts them from their factfinding responsibilities, and creates a strong

19  possibility of confusion." *Shannon v. United States*, 512 U.S. 573, 579 (1994). Information bearing on

20  punishment is simply "irrelevant to the jury's task." *Id*. This principle is reflected in the Ninth Circuit

21  Model Criminal Jury Instructions: "The punishment provided by law for this crime is for the court to

22  decide. You may not consider punishment in deciding whether the government has proved its case

23  against the defendant beyond a reasonable doubt." Model Crim. Jury Instr. 6.22 (2022 ed.); *see also*

24  *United States v. Lynch*, 903 F.3d 1061, 1081 (9th Cir. 2018) (rejecting challenge to this jury instruction).

25           The defense should thus be precluded from making any reference to prospective punishment or

26  any other fallout in any phase of the trial. References to penalties and potential collateral consequences

27  could be as overt as "this case has serious consequences for the defendant," "the defendant's liberty is at

28

1    stake in this trial," "the defendant will never be able to get a job with a criminal record," or "the

2    defendant has already spent enough time in jail." The Court cannot "un-ring the bell" once the jury hears

3    any reference to the consequences of a conviction and the damage cannot be neutralized by a curative

4    instruction.

5            For similar reasons, testimony or evidence relating to the defendants' personal circumstances,

6    financial straits or obligations, stress, health, or references to the effect of the investigation or conviction

7    upon them or any other person are irrelevant to the charges and should be precluded. This kind of

8    information amounts to an appeal to juror sympathy that would distract jurors from their fact-finding

9    duties.

10           The Ninth Circuit Model Criminal Jury Instructions require jurors to "not . . . be influenced by

11   personal likes or dislikes" or by "sympathy." Model Crim. Jury Instr. 6.1 (2022 ed.). Courts regularly

12   preclude criminal defendants from seeking to elicit jurors' sympathy because the means by which

13   defendants do so often are irrelevant to the elements of the charged offenses. *See, e.g.*, *United States v.*

14   *Mendoza*, No. 16-CR-0150-BLF, 2021 WL 1238314, at *3 (N.D. Cal. Apr. 2, 2021) (granting

15   government's motion *in limine* to preclude defense attempts to elicit jury sympathy); *United States v.*

16   *Gomez*, 772 F. Supp. 2d 1185, 1197 (C.D. Cal. 2011) (granting government's motion to preclude

17   improper defendant hearsay statements and references to punishment and sympathy). The Court should

18   bar the defense from referring to the defendants' personal circumstances or topics designed to elicit

19   jurors' sympathy if such topics do not bear on the defendants' guilt or innocence of the charged

20   offenses.

21           Finally, the defense should be precluded from pursuing jury nullification. Neither a defendant

22   nor his attorney has a right to present evidence or argument that is irrelevant to an element of, or a legal

23   defense to, the crime charged; verdicts must be based on the law and evidence, not on jury nullification.

24   *See Merced v. McGrath*, 426 F.3d 1076, 1079 (9th Cir. 2005) (affirming district court's dismissal for

25   cause of a juror who expressed belief in exercising power of jury nullification and noting that "while

26   jurors have the power to nullify a verdict, they have no right to do so"); *United States v. Powell*, 955

27   F.2d 1206, 1213 (9th Cir. 1991) (affirming district court's refusal to instruct the jury that it can nullify).

28           The Court should preclude the defense from suggesting that the jury should not convict the

GOVERNMENT'S MOTIONS IN LIMINE                  14
CASE NO. 3:23-CR-00030-SI

1  defendants because, for example, they have limited criminal history, were suffering from addiction, have

2  families to take care of, or "have already suffered enough." Nor should the defense be permitted to argue

3  or suggest that the government should have used its resources in other ways, including by minimizing

4  the seriousness of the multiple felony charges, questioning whether the government should have charged

5  the defendants in the first place, suggesting that the losses or magnitude of the harm caused were not

6  serious or significant enough to merit a federal prosecution, or characterizing the case as not worth the

7  jury's time (e.g., "this petty case"). Whether such comments evoke concepts of punishment, urge jury

8  nullification, or both, they are improper under the law. They would present irrelevant and plainly

9  prejudicial facts and argument to the jury, and would cause the jury to focus, impermissibly, on the

10  potential legal consequences of the alleged crimes rather than the factual question of the defendants'

11  guilt or innocence. The Court should not permit the defense to pursue such a strategy, whether in

12  statements to the jury or in questioning witnesses.

13  ## CONCLUSION

14        For the foregoing reasons, the government respectfully requests that the Court grant its motions

15  *in limine*.  The government also respectfully reserves the right to supplement these motions *in limine* if

16  additional issues arise that require the Court's intervention.

17

18  DATED:  July 20, 2023                                        Respectfully submitted,

19                                                              ISMAIL J. RAMSEY

20                                                              United States Attorney

21

22                                                              /s/_____

23                                                              HILLARY T. IRVIN

23                                                              SOPHIA COOPER

                                                                Assistant United States Attorneys

1

2

**CERTIFICATE OF SERVICE**

3

I hereby certify that a true and correct copy of the above motion was served on July 20, 2023, on all parties of record using CM/ECF.

4

5

6

Sincerely,

7

/s/ _____
HILLARY T. IRVIN
Assistant United States Attorney

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GOVERNMENT'S MOTIONS IN LIMINE          16
CASE NO. 3:23-CR-00030-SI